IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 13, 2010

**STATE OF TENNESSEE v. GERRY TALLANT**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-05423     James C. Beasley, Jr., Judge**

**No. W2009-00585-CCA-R3-CD  - Filed January 25, 2011**

The appellant, Gerry Tallant, was convicted by a Shelby County Criminal Court jury of first degree murder, for which he received a life sentence.  On appeal, the appellant contends that the evidence is insufficient to support his conviction, that the trial court erred when it instructed the jury on criminal responsibility, and that the State's closing argument was improper.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Gerry Tallant.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee.

**OPINION**

**I.  Factual Background**

On August 7, 2007, the Shelby County Grand Jury indicted the appellant for the premeditated first degree murder of the victim, David Williams.  The State's proof at trial revealed that the victim was dating Tracy Tallant, the appellant's daughter, and they had an eight-month old son together.  The appellant owned a house at 9229 Kerrville-Rosemark Road in Memphis, but he lived with his girlfriend, Tina Camplin, in Mississippi.  With the

appellant's permission, Tracy lived in the appellant's Memphis house.[1] Although the victim did not have the appellant's permission to live in the house, he stayed with Tracy approximately half of every week.

On April 23, 2007, the appellant and Camplin drove to Memphis, stopping first at Sanford Ruffin's apartment. At around 7:00 or 7:30 p.m., the appellant drove Camplin and Ruffin to 9229 Kerrville-Rosemark Road. Camplin went to buy crack cocaine from the victim; Ruffin and the appellant went to "kick [the victim's] ass" because of his ill treatment of Tracy. Camplin did not see the appellant or Ruffin with a gun; however, the appellant often carried a gun and had a permit to do so.

The appellant parked on the street beside the residence and remained in the truck while Camplin and Ruffin went inside the residence. Camplin purchased twenty dollars' worth of crack cocaine. Ruffin stayed in the house in the bathroom, but Camplin returned to the truck.

The appellant got out of the truck and went in the house; Camplin sat in the truck to use part of the crack cocaine. Within a few minutes, she heard at least five shots fired in rapid succession. A couple of minutes later, the appellant returned to the truck, looking like he was "in shock." One or two shots followed, then Ruffin hurriedly returned to the truck. Afterward, they returned to Ruffin's apartment but did not talk about what happened.

Later that night, Tracy went with a friend to the Millington Police Department to ask for help getting a black man who lived with Tracy out of her residence. Tracy told police the man was possibly armed with handgun and/or in possession of narcotics. Although Tracy's address was located only four or five miles from the police department, the address was in the sheriff's department's jurisdiction. Therefore, Shelby County Sergeant Glen Ray Essary, Jr., was dispatched to handle the complaint.

At approximately 9:00 p.m., Sergeant Essary and several other officers proceeded to Tracy's address. Although the residence was not well-lit, officers saw the front door had been forced open, indicating a crime had been committed. When the officers entered the residence, they saw the victim's lifeless body on the floor of the living room.

Tracy and her friend had followed police to the residence. After discovering the body and securing the scene, police placed Tracy and her friend in separate vehicles. Shelby County Deputy Charles Wallace noticed a small, .380 caliber semiautomatic handgun that

---

[1] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

was silver with a black handle in Tracy's vehicle.

Afterward, Shelby County Lieutenant John Mills and Sergeant Robert Butterick went to the residence to search for and collect evidence. In the living room, the victim "was laying face down with his head towards the front door, feet towards the kitchen area, both hands, arms up underneath him" in a "defensive" manner. There was a small, chrome, semiautomatic .380 caliber pistol in his right rear pocket. Additionally, a small bag of crack cocaine was in the "change pocket" at the top of his right front pants pocket, and a small, plastic bag containing 9.4 grams of marijuana was in his victim's left front pants pocket. The victim was clutching three twenty-dollar bills and two five-dollar bills in his hand.

While examining the residence, the officers noticed an ironing board in the kitchen area and a still-warm iron on the kitchen counter. There were two bullet holes in the floor: one had gouged a dent in the wood underneath the carpet and one beside the victim's head had gone completely through the floor into the foundation underneath the house.

The victim's gun was empty when it was removed from his back pocket, but there was a box of ammunition on an entertainment center in the living room. No expended shell casings were found in the house, indicating that either a revolver, which does not eject shell casings after firing, was used in the shooting or that someone using a pistol picked up the expended shell casings.

Later on the night of the homicide, police determined that the appellant was a "person of interest." From a disturbance call, police determined that the appellant was at Ruffin's apartment. When police went to Ruffin's apartment, they confiscated from the appellant a small, two-shot, .38 caliber, Davis derringer pistol and a .357 stainless steel Ruger revolver. From Ruffin, police confiscated a .40 caliber Ruger pistol, a .357 blue Smith and Wesson revolver, and a .22 caliber pump-action rifle.

On the day after the homicide, Tracy gave a statement to Shelby County Sheriff's Sergeant Kevin Helms describing the suspect as "a stocky male black, bald hair with two stud earrings and a small cream colored type truck." Sergeant Helms was familiar with an individual matching that description, but he was in custody at the time of the murder. Therefore, Sergeant Helms suspected Tracy's statement was not entirely truthful. Sergeant Helms detected no bruises or injuries on Tracy, but he noted that she was wearing baggy jeans and a sweatshirt.

Camplin also gave a statement to police, implicating Ruffin and the appellant in the shooting. However, she averred that she gave the statement because she was scared, maintaining police threatened to send her to jail. Camplin stated that the victim was not the

father of Tracy's baby.

The appellant gave two statements to police. In his first statement, he denied any involvement in the shooting. However, after police pointed out known facts and inconsistencies in his version of events, he gave a statement implicating himself but asserting self-defense. The appellant said he went to the residence to pick up a disability check. Knowing the victim was abusing Tracy, he also planned to get the victim out of the house or to find a way to stop the abuse. The appellant took a chrome .357 Ruger with him. Ruffin, who had a .357 black/blue steel revolver, went along as backup. The appellant walked in the house and saw a man standing there. The man "hollered" and started reaching for something; the appellant became scared and fired at the man six times, emptying his gun.

Dr. Lisa Funte performed the autopsy on the victim and determined the victim's death was caused by multiple gunshot wounds, all of which were "distant gunshot wounds" made from at least a few feet away. In addition to at least three non-fatal gunshot wounds, Dr. Funte discovered three fatal wounds: one which entered the back of the victim's head; one which penetrated the victim's right lung after entering the center of his chest; and one which entered his neck, lacerated the aorta and trachea, and went through the pericardial sac covering the heart. The gunshot wounds were consistent with shots being fired in rapid succession while the victim fell. Additionally, the wound to the back of the victim's head was consistent with the shooter standing over the victim as he lay face down on the floor.

Two pistols collected from the victim and Tracy at 9229 Kerrville-Rosemark Road and four handguns collected from the appellant and Ruffin at Ruffin's apartment were submitted to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. Six bullets or bullet fragments discovered during the victim's autopsy were also sent to the TBI. Shelly Betts, a TBI firearms identification and ballistics expert, performed the tests. Although some of the bullets and bullet fragments "had no markings of comparison value," she determined that the bullet fired into the back of the victim's head came from Ruffin's .357 Smith and Wesson revolver. She determined the other two fatal bullets were fired from the appellant's Ruger .357 revolver. A gunshot residue test was performed on the victim's hands, but the results were inconclusive.

The defense's proof at trial was that the fifty-six-year-old appellant owned the house at 9229 Kerrville-Rosemark Road, had lived there before, and stayed there every two weeks when he came to Memphis to collect his disability checks. The appellant said that he "had several run-ins over the last five years" with the victim and that the victim repeatedly threatened him and his daughter over the telephone. During one of Tracy's visits in Mississippi, the appellant saw a bruise on her cheek and bruises on her arms and legs.

The appellant said Tracy had his permission to live in the house, but the victim did not. The appellant did not always know when the victim had been in the house because he would leave upon learning the appellant was coming to visit.

When the appellant arrived in Memphis on April 23, 2007, he went to Ruffin's apartment. The appellant said he was "[n]ot that bad [upset]" about the abuse, but he planned to get the victim out of the house. However, Camplin wanted to first buy crack cocaine from the victim. The appellant explained that Camplin was unable to speak and that Ruffin knew the victim; therefore, Ruffin went along to be Camplin's "mouthpiece" during the drug purchase. Ruffin did not go to assist the appellant in evicting the victim. The appellant took his .357 Ruger revolver, and Ruffin had a .357 Smith and Wesson revolver.

At the house, the appellant parked behind a two-car shed on the property because Camplin feared that the victim would leave if he saw the appellant, and she would not be able to get her drugs. The appellant waited in the truck while Camplin and Ruffin went in to purchase drugs.

A couple of minutes later, Camplin returned to the truck, alone. The appellant waited a few minutes for Ruffin then went into the house. He did not need to use his key because the front door was cracked open. The only illumination in the front of the house came from a small, fluorescent light above the sink in the kitchen.

The appellant did not know Ruffin's location, but he saw the victim in the kitchen "hunkered down . . . doing something at the sink." It took the appellant "a moment" to recognize the victim because he had cut his hair. The appellant said nothing, but the victim noticed him a few seconds later. The victim screamed "you mother f[*****] and he went for his hip," moving toward the appellant. The appellant believed the victim was reaching for a gun because he knew the victim carried a pistol. The appellant then shot the victim. The appellant fired six times, emptying his gun and hitting the victim with five of the shots, including once in the head. He acknowledged that he was an experienced shooter. He said that he was afraid and was defending himself.

The appellant said that afterward he was upset, scared, and nervous. He felt sick, ran outside, and tried to vomit. After regaining his composure, he went to his truck. He began thinking he should check on the victim and got out of the truck. At that time, he heard two gunshots and saw Ruffin come out of the house. The appellant and Ruffin got into the truck, and they returned to Ruffin's apartment. There was no discussion of what happened at the house.

The appellant said that later that night, a man "bust[ed] in the front door" of Ruffin's

apartment. When police arrived to investigate the altercation, the appellant did not inform police of the shooting even though he thought the victim was dead. He admitted his first statement to police about the shooting was not truthful, but he averred that his second statement was. He conceded that he once told police that Ruffin accompanied him to "watch [his] back."

The appellant acknowledged that he told Tracy that she and the baby should get out of the house before he got there, but he maintained that he had not anticipated violence. The appellant stated that he did not think he could "beat [the victim] up" because the appellant suffered from terminal cancer and a heart condition. The appellant said he wanted the victim out of the house because he abused Tracy and he was selling drugs out of the house. The appellant feared he would lose the house and Tracy would lose custody of her baby if the victim were caught selling drugs from the house.

The appellant acknowledged that Camplin was supposed to get the victim to come to the door, but he maintained that it was "just happenstance" he parked his truck where it could not be seen from the house. He did not know if the victim shot Ruffin or if Ruffin shot the victim.

Amber Leigh Martin and Rebecca Marie Stepp, friends of Tracy, testified that they had previously seen the victim be violent toward Tracy. Martin witnessed the victim beat Tracy. Additionally, Martin said that when Tracy stopped living with the victim and moved into a duplex, the victim broke all of the windows out of the duplex. Stepp said that on one occasion, the victim choked Tracy, stopping only when Stepp reminded him that her child and Tracy's baby were in the house. Later, the victim held Tracy's baby up by the leg and threatened to hang it.

Michelle Jones, an employee of the criminal court clerk's office, testified that the victim had a prior conviction for domestic violence. However, the offense was not committed against Tracy.

Based upon the foregoing, the jury convicted the appellant of first degree premeditated murder, and he received a sentence of life imprisonment. On appeal, the appellant argues the evidence is not sufficient to support his conviction, the trial court erred in giving a criminal responsibility instruction and the State's closing argument was improper.

## II. Analysis

### A. Sufficiency of the Evidence

We will first address the appellant's challenge to the sufficiency of the evidence supporting his conviction. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted of first degree premeditated murder. In order to sustain that conviction, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

The evidence reveals that the appellant and Ruffin, both armed with revolvers, went to confront the victim, who was also known to carry a weapon. The men wanted to "kick [the victim's] ass" because he had abused the appellant's daughter, Tracy. The appellant told

Tracy to take the baby and leave the house before he went. The appellant arranged for Camplin to go inside and ensure the victim was there, knowing the victim would not come to the door if the appellant were there. Thereafter, the appellant went inside unannounced. After startling the victim, the appellant emptied his gun into him. The autopsy and ballistics results confirmed that bullets from the appellant's gun caused at least two of the victim's fatal wounds. A third wound to the back of the victim's head came from a bullet from Ruffin's gun, which was likely fired while the victim was lying face-down while Ruffin stood over him. The men left without trying to obtain medical aid for the victim. We conclude that this evidence is sufficient to sustain the appellant's conviction for first degree murder.

## B. Self-Defense

The appellant also contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. The appellant maintains that his use of deadly force was justified because he was acting in self-defense. See Tenn. Code Ann. § 39-11-611. Generally, if evidence is introduced supporting self-defense, the burden is on the State to prove beyond a reasonable doubt that the appellant did not act in self-defense. See Tenn. Code Ann. § 39-11-201(a)(3). However, whether an appellant acted in self-defense is a factual determination to be made by the jury. State v. Goode, 956 S.W.2d 521, 522 (Tenn. Crim. App. 1997). Although the trial court properly charged self-defense to the jury, the jury clearly rejected this defense. The appellant and Ruffin armed themselves and went to make the victim, who was also likely armed, leave the house. The appellant said that the victim yelled curses at him and came toward him; therefore, he fired at the victim in self-defense. However, the physical evidence belies this claim. The appellant said he could not see the victim very well and that the victim was standing in the only portion of the kitchen/living room area that was lit. Accordingly, the victim could probably saw the appellant even less. Although the appellant said the victim charged at him, there was an ironing board in the way, which would have interfered with the victim's approach if the appellant's version of events was correct. The appellant, an admittedly expert marksman, emptied his gun into the victim, causing at least two fatal wounds. Therefore, we conclude that the jury had ample evidence from which it could conclude that the appellant did not act in self-defense.

## C. Criminal Responsibility

The appellant makes two closely related arguments regarding criminal responsibility. First, he maintains that the evidence was insufficient to prove that he was criminally responsible for Ruffin's actions. Second, he asserts that the trial court erred by instructing the jury on criminal responsibility.

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when the appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997). Moreover, this court has previously explained that

> [p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred. No particular act need be shown. It is not necessary for one to take a physical part in the crime. Mere encouragement of the principal is sufficient.

State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App.1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

As we noted earlier, there was sufficient evidence in the instant case to find the appellant guilty of first degree premeditated murder as the principal offender. However, there was also sufficient evidence to warrant an instruction on criminal responsibility and to sustain a conviction based upon that theory. The proof at trial reflected that the appellant and Ruffin discussed the victim's abuse of Tracy and decided to exact retribution. The men armed themselves and went to the residence unannounced. Camplin lulled the victim into a false sense of security, while Ruffin hid in the bathroom. The appellant came in and

emptied his revolver into the victim. Ruffin then fired the final, fatal shot to the back of the victim's head. Therefore, the proof establishes that the men acted in concert to achieve the victim's death.

The appellant maintains that instructing the jury on criminal responsibility may have resulted in a "patchwork verdict," with some jurors finding the appellant guilty as a principal offender and others finding the appellant guilty under a theory of criminal responsibility. However, the appellant correctly "concedes that the weight of Tennessee authority stands against his position." Tennessee case law establishes that there is no danger of a "patchwork verdict" when the State proceeds on a theory of criminal responsibility as well as a theory that the appellant was the principal offender. Our supreme court has previously explained that "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Therefore, because "[t]he right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based upon a single criminal occurrence[,] . . . where the State seeks to prove one crime arising from one event, we may presume that the jury's general verdict was unanimous." Id. at 171. Thus, the appellant is not entitled to relief on this basis.

## D.  Closing Argument

As his final issue, the appellant complains that "the trial court erred when it allowed the prosecution to unfairly argue in closing argument that defense counsel is a master of deceit." During closing argument, the State urged the jury to employ common sense in determining whether the appellant committed first degree murder, as alleged by the State, or acted in self-defense, as alleged by the defense. The State explained:

> Say . . . somebody has a rock and they put feathers on it and draw a face and try to sell it to you as a chicken. Well it's still a rock. That's what defense counsel has done throughout the week. That's what he's going to get up during his summation and try to do.
>
> . . . .
>
> I submit to you [the appellant had a plan to kill the victim] and the proof that we presented this week to you was solid as a rock. Don't let defense counsel come up here and put feathers around it, draw eyes on it and try to sell it to you as a

chicken.  Don't buy it.

During closing argument, defense counsel stated:

> Ducks, put a mouth on it.  Ducks don't have feathers.
> (Indiscernible).  Of course I'm not telling you it's one. . . .  The
> lawyers are supposed to help you understand facts and the law
> so that when you leave here today and we're through with this
> case that you're proud of what you've done, that you've
> presented . . . a reliable verdict based upon the law and facts in
> this case, not based upon conjecture . . . [or] speculation . . . .
>
> . . . .
>
> And despite all their argument and talking about putting
> little feathers on rocks, [the State] can't prove it's not self-
> defense so they have to make cute little arguments like that to
> try to convince you . . . to convict him.

In rebuttal closing argument, the State emphasized that there were two sides of the
story regarding what happened to the victim.  The State said:

> [Defense counsel] has implied that somehow you've
> gotten too many pictures, you've seen too much stuff.  Yeah,
> you have.  But what are your two tools?  The facts and the law.
> I'd rather err on the side of you getting too much information
> than not enough.
>
> Now [defense counsel] has implied somehow [the
> State's] argument is improper because of [its] analogy to the
> duck – to the rock.  [Defense counsel] has paraded his cell
> phone in front of you with an analogy like his phone is a duck.
> Now this is serious.  We're not playing games here. . . .
>
> [Defense counsel] is a master of saying one thing –[2]

---

[2] In a footnote in his appellate brief, the appellant states:

Although the record seems to indicate the State merely said "[Defense

(continued...)

At that point, defense counsel objected, arguing, "This isn't about [defense counsel]. [Defense counsel] isn't proof in this cause. Make counsel argue the proof in this cause." The trial court overruled the objection, finding that the State "can comment on the argument." At that point, the State emphasized that it, like defense counsel, was trying to help the jurors understand the facts and the law and that the State's argument was not based upon speculation.

On appeal, the appellant contends that the State's argument was improper and that the trial court erred in overruling his objection. The appellant maintains that "the State's assertion that defense counsel is a master of deceit implied that the entire theory of defense was little more than a common lie perpetrated not only [by the appellant], but by counsel as well."

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
> (2) the curative measures undertaken by the court and the prosecution[;]
> (3) the intent of the prosecutor in making the statement[;]
> (4) the cumulative effect of the improper conduct and any other errors in the record [; and]

---

[2](...continued)
counsel] is a master of saying one thing-" before being interrupted, at the hearing on the motion for new trial, the parties and the trial court all indicate that the State made some reference to defense counsel as a master of deceit. It would seem that the court reporter was unable to record the simultaneous statements of defense counsel and the State.

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. Moreover, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007).

Turning to the instant case, we note that the prosecutor's comment was brief, and there is no evidence he intended to unduly prejudice the appellant by his remarks. Additionally, based upon our review of the closing arguments, we conclude that the State's remarks in rebuttal closing argument were clearly in response to the appellant's insinuations during closing. See State v. Timothy Wayne Holland, No. M2001-03129-CCA-R3-CD, 2002 WL 31007428, at *6 (Tenn. Crim. App. at Nashville, Sept. 4, 2002). Accordingly, we can discern no impropriety by the State in its closing. Moreover, although the trial court gave no curative instruction to the jury, the appellant did not ask for an instruction. Therefore, we conclude that the appellant is not entitled to relief on this issue.

### III. Conclusion

Based upon our review, we conclude that the evidence was sufficient to sustain the appellant's conviction for first degree murder, that the jury was entitled to find the appellant did not act in self-defense and was criminally responsible for Ruffin's actions, and that the trial court did not err by instructing the jury on criminal responsibility and in overruling the appellant's objection to the State's closing argument. Therefore, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE